Eicii, Judge,
dissenting from the grant of the petition, with whom Almond, Judge, joins:
The Petition for Rehearing, filed by the Patent Office, should be denied. None of the reasons advanced for granting shows compliance with our rule on rehearings. In effect, as hereinafter explained, our four-to-nothing opinion is the result of a careful ^consideration of an earlier opinion, which is equivalent to a rehearing.
Rehearing at this time can serve only to foster uncertainty in the law, to encourage the Patent Office in its policy of refusing to follow *1377 what this reviewing court has now declared the law to be and to have been, at least since 1952, and to prolong the controversy about what the law is.
A major function of courts, be they right or wrong, is to settle disputes about the law one way or the other. Of course, even after decision, the debate may continue and there will always be those who disagree with the conclusion the court has reached; but it is not proper for a court, on a relatively simple question of statutory interpretation like this one, to further the debate by vacillation once it has rendered its decision without a single dissent.
i. The Buie
The only reason justifying the grant of rehearing is that the court has overlooked or misapprehended something. Our Rule 7, entitled “REHEARINGS,” which here controls, reads in pertinent part:
Tie petition in each case shall be confined to a brief statement of points supposed to have been overlooked or misapprehended by the court, with proper references to the particular portion of the transcript of the record or original briefs relied upon, and with authorities and suggestions, concisely stated, in support of the points.
The Patent Office has not filed such a petition. Its petition, which is most disrespectful in tone, charges us generally with ignoring[1] and overlooking “important issues” and “prior adjudications of this court and others, including the Supreme Court.”[2] More particularly, we are charged with “Completely disregard[ing]” the holdings in certain of our own prior cases. In the guise of demanding by way of a rehearing, “the right to know why these pronouncements are ignored,”[3] the solicitor is merely asking for further explanation of why we have refused to adopt his desired interpretation of some of our own utterances. The simple answer is that we did not agree with his desired interpretation. The reasons were fully developed in our opinion.
In the event the solicitor is unable to reconcile what we have said in this case with what the court has said in some older cases, the time has come to repeat once more the words of Judge Smith, as *1378 quoted by Judge Almond in In re Riden, 50 CCPA 1411, 1415, 318 F.2d 761, 138 USPQ 112:
We * * * caution again against the tendency “to freeze into rules of general application what, at best, are statements applicable to particular fact situations.” [Citing Judge Smith’s opinion in In re Mills, 47 CCPA 1185 1190, 281 F. 2d 218, 126 USPQ 513.]
This has been stated many times by many judges in many different ways as a fundamental of American jurisprudence but zealous advocates have to be constantly reminded of the truism that opinions are written to explain the decisions in particlular cases and must be construed in that light. The reasoning on one fact situation is not applicable to utterly different facts; much less are the particular statements applicable.
The solicitor’s next point is that we failed to realize that the appealed claims “are not commensurate with the designated holding or principle set by the majority.”[4] Since the opinion itself contains a detailed consideration of the claims, the implication here is that we lack the capacity to construe patent claims. This is a matter frequently involved in patent appeals and one on which we do not always see eye-to-eye with the Patent Office.
Finally, the solicitor makes an argument to the effect that we have authorized the granting of a patent which would “confer upon a patentee the right to exclude others from thinking in a certain manner.” This, we are told, would make the patent statutes, as we have construed them, unconstitutional as in violation of the First Amendment.[5] This is an entirely new proposition, never suggested before in this case, and is thus entirely improper on a petition for rehearing. Moreover, as counsel for Prater point out, in furthering this argument the Patent Office has deliberately misquoted from Prater’s brief by the omission of a qualifying introduction to a sentence, turning it into an alleged admission of something Prater did not admit with respect to the scope of a claim. We did not sanction *1379 claims which, would preclude people from thinking, Prater did not ask for such claims, and surely no court would ever place such a construction on the claims which were before us. Their construction by the Patent Office is therefore an improper construction. Prater’s statement, in objecting to the petition, is that “There is no such thing as mental infringement” and that “thought is still unpatentable.” This is unquestionably true.
So much for the nature of the petition and why it fails, under our Pule, to point out any ground on which we can properly grant the petition.
n. The Oase Has Already Been Reconsidered
The second point is that this case has already been as thoroughly considered as a case can be, including full-scale reconsideration and revision of an earlier “majority” opinion of Judge Smith.
In fairness to other litigants in this court, with its growing backlog, no more judicial man-hours should be expended on this case, especially when we are short a judge by reason of Judge Smith’s death and when we have already cut back by five cases a month the cases planned to be heard in the two months of December and January on account of it.
In a statement which he appended to Judge Smith’s opinion, the Chief Judge has already made known that this case was argued eight months ago, on May 9, 1968, and that Judge Smith wrote an earlier opinion which he revised and rewrote, the final version having been adopted by a majority on November 8, 1968.
After court convened for the October hearings and while they were in progress, Judge Smith initiated, about October 10, steps to obtain the views of all members of the court, and the supporting legal staff, as to how his earlier opinion, done on July 5,1968, might be improved and revised so as to meet with general approval. Views having been collected from various sources, a concentrated effort was put into a revision over the course of about two weeks preceding November 8, when it was completed except for the inevitable minor corrections. It was in final form and sent to the reproduction department for final run on November 15 and was therefore a decided case in condition to be handed down, awaiting only decision by the other two out of the five judges[6] as to the position they wished to take when Judge Smith quite unexpectedly died.
Like many of our opinions, this one in particualr was not altogether the work of one man. It was checked by many technically *1380 and legally competent hands, with which the court is equipped — at least a half-dozen beside the three judges who joined in it.
Anyone who knows how opinions are produced, revised, checked, and finally handed down will realize that in this case, where it was in process for six months and reviewed in five chambers, many of which contributed to it, it is not likely that anything was overlooked or misapprehended.
irt. The Issue is Not Complex
It has been suggested that this case is one of the most complicated, technically and legally, with which we have ever had to deal. This is not so. While the technology is perhaps mathematically awesome, the economic impact of our decision tremendous, and the administrative problems of the Patent Office horrendous if it is obliged to abide by our decision, the case really boils down to a simple question or two of law. The technology is not as bad as many of our cases. Some have approached this case as though we were obliged to decide a momentous position of public policy: should computer programs be patentable? This is the problem the Patent Office presented to Congress, where the question belongs, submitting a bill implementing the recommendation of the President’s Patent Commission that they be declared to be not patentable. But we are not at all concerned with what ought to be. We are not a policy-making body but a court of law. The simple question which has been before us is whether appellants’ claimed process and apparatus are patentable under the existing statutes.
The statutes (35 USC 101, 102, 103, and 112) are those with which we most commonly deal day in and day out. A relatively few prior decision were relied on by the Patent Office to support its rejection — about a half dozen. If the decision is a “landmark” it is not because of its difficulty but because of its potential economic importance. While that may make us cautious, it does not make our task difficult; nor does it add any complexity. We have thoroughly considered the statutes, the cases, and the arguments and we have rendered our decision to the best of our ability. If we go through the process again, we can do no more. There has been no disagreement expressed of record on the court.
xv. Proper Judicial Administration Calls for Denial of the Petition
We have already given this case a disproportionate number of judicial man-hours. Judge Smith devoted most of this túne to it for *1381 the last two months of his life, in addition to the time spent at the end of last term preparing the first opinion. The backlog of this court is growing and so is our disposal time. We have cut back on our planned hearings by 20% since Judge Smith died. We owe it to the other litigants and the judicial system to get on with our work. Under the circumstances above outlined, proper administration of the court’s business alone dictates that we should deny the requested rehearing.

 This word carries the connotation of deliberate action.

 It is, of course, the duty of the Patent Office Solicitor, who is saying this, to call the court’s attention to any “adjudications,” that is to say cases, on which he relies. We have not overlooked but have carefully studied any cases he cited, as our opinion shows on its face, and many more besides. His real complaint is that we have not agreed, with the interpretations he has placed on prior cases as a matter of law, including naive attempts to elevate certain obiter dicta, and even arguments of counsel quoted in opinions, into binding rules of law in a field of technology never ,dreamed of wheni the dicta were uttered in other contexts.

 See note 1.

 The Patent Office petition consistently describes with considerable reiteration, the members of the court joining the decision as “the majority,” a term usually implying that there was a dissent, or a minority taking a different view. Readers are cautioned to remember that there has been neither a dissent nor a minority opinion in this ease. The only justification for calling the four-to-nothing court a “majority” resides in the failure of the Chief Judge to participate on the ground that he did “not presently feel qualified to participate in the merits of the decision * *

 “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances.”
The Patent Office brief in support of the petition for rehearing cites Thomas v. Collins, 323 U.S. 516, 531, for the statement that, “The First Amendment gives freedom of mind the same security as freedom of conscience.” It then argues that Prater and Wei’s patent will inhibit “freedom of secular thought.”

 For reasons of personal tragedy Judge Kirkpatrick was not able to consider the final opinion between the time he received a copy of it and the time it was handed down on November 20, the day of Judge Smith’s death.