**Frank BUZZELLI,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**MINNESOTA MINING & MANUFAC-**
**TURING CO., Defendant-Appel-**
**lee-Cross-Appellant.**

Nos. 74–2021, 74–2022.

United States Court of Appeals,
Sixth Circuit.

July 23, 1975.

Leslie W. Fleming, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., Donald M. Sell, Alexander, Sell, Seldt & Delahunt, Richard E. Brink, St. Paul, Minn., for 3M.

Charles W. Chandler, Livonia, Mich., for Frank Buzzelli.

Before PHILLIPS, Chief Judge, and PECK and LIVELY, Circuit Judges.

JOHN W. PECK, Circuit Judge.

This is the second appeal in this patent infringement action brought by plaintiff Frank Buzzelli against defendant Minnesota Mining and Manufacturing Company (hereinafter "3M"). The first appeal resulted in the reversal of a summary judgment entered in favor of 3M on the grounds that the district court failed to consider certain issues of material fact concerning the obviousness of the process involved in the patent and applied an improper standard in determining obviousness. 480 F.2d 541 (6th Cir. 1973). Following the trial on remand, the district court, sitting without a jury, found that 3M had infringed plaintiff's patented "Method for Retaining Hair" by selling "Scotch" brand "Hair Set Tape" for use in practicing the patented process; but the court also found that the patent in suit was invalid because the process was anticipated by uses which were in the public domain (35 U.S.C. § 102) and was obvious "to one of ordinary skill in the art" (35 U.S.C. § 103). Further, the district court held that the patent was unenforceable because of the "inequitable conduct" displayed by plaintiff in failing, during the patent application process, to call attention to material and relevant prior art and in misrepresenting the state of the prior art. Plaintiff here challenges the district court's rulings with regard to invalidity and unenforceability, and 3M cross-appeals from the finding of infringement.

The patent in suit, No. 3,464,424, titled "Method for Retaining Hair," issued September 2, 1969, on an application filed October 23, 1965, which application was a continuation in part of an earlier application which had been abandoned.

The patent involves, in the words of the district court, "the combination of sequential steps of (a) wetting the hair, (b) shaping the hair, (c) holding the shaped hair in place with *porous* pressure-sensitive adhesive tape adhered to the hair and the skin, and (d) drying the hair under the tape." The only improvement over the prior art was plaintiff's substitution of a porous tape for a non-porous tape in step (c). The infringement as alleged and found by the district court resulted from 3M's marketing of a product called "Scotch Hair Set Tape" for use in setting hair.

The idea of taping hair in place to aid the hair setting process was not novel in 1964. As the district court found, women and hair dressers had been using various types of pressure sensitive adhesive tapes for this purpose since at least the early 1950's. 3M advertised the fact that its cellophane tape could be used for holding hair in place prior to 1964, although no 3M tape was marketed for that specific use until 1964 when its "Scotch Magic Mending Tape" was packaged and advertised as a hair setting tape. Rapid ascendancy of short hairstyles for women in 1964 accelerated the general use by women of tape to aid in setting their hair. At about the same time, the "conditioned air dryer" came into usage in the trade. This dryer pushed air down onto the hair rather than pulling the hair up in the method of the traditional dryer. These two factors, the increased usage of tape and the new design hair dryer, aggravated two problems associated with the non-porous tape. First, the tape was often painful to remove because it pulled hair out and irritated the skin, and secondly, the hair in contact with the tape did not dry properly.

Plaintiff Buzzelli, a professional hair stylist, used masking tape in 1964 for setting hair, but he was dissatisfied with its performance, especially with its drying properties. His solution, arrived at in May, 1964, was to punch holes in the tape to permit air to pass through the tape backing. This technique not only

aided drying, but had the unexpected result of making removal less painful. Plaintiff continued to experiment with perforated tape and in early 1965 contacted the Brady Tape Company which provided him with 10,000 feet of perforated tape to his specifications. According to plaintiff, this tape was well received at various hair styling conventions and he had many requests for it. Problems with the Brady tape caused plaintiff to try a tape prepared by the Forbes Label Tape Company, but this tape too was found lacking. However, while discussing his requirements with the Forbes people, plaintiff was told that 3M had a surgical tape that might be useful.

3M had developed and marketed a microporous tape (U.S. Patent No. 3,121,021) for medical applications prior to 1964. The district court found that "[t]he tape was widely described in both technical and popular literature . . . as being relatively non-irritating to the human skin and tenaciously adherable even to hairy areas of the skin with 'surprisingly painless removal without epilation.'" This tape was marketed under the "Micropore" trade-mark. After receiving a number of complaints concerning the use of "Magic Mending Tape" in hair setting applications, 3M conducted tests which disclosed that "Micropore" tape was the more suitable tape for taping hair. After modifying the appearance of the "Micropore" tape to avoid confusion between the medical and hair setting applications, 3M introduced this tape under the "Hair Set Tape" label in 1967.

While plaintiff continued his search for a suitable tape in early 1965, he contacted his attorney with the idea of filing a patent application for perforated tape and its method of use. This application, No. 437,038, was filed in the belief that plaintiff had invented a new perforated tape, but it soon became apparent that tape with holes in it was not a new invention. Further prosecution of this application centered on the method claims, and was later totally abandoned. A second application was filed in October, 1965.

Neither application, at any point in the disclosures or in the prosecution histories, acknowledged that the use of pressure sensitive adhesive tape to set hair was known to the art at the time of the alleged invention. Both of these applications were, however, specifically directed to the use of pressure sensitive adhesive tape to set hair. The earlier application acknowledged only that:

"The normal method of obtaining a particular hair dressing or coiffure is to wash the woman's hair and then while the hair is damp, set it in a particular pattern and retain it in this manner while the hair dries."

The later application which matured into the patent discussed the prior art in the following terms:

"This method is an improvement on the established technique of setting a woman's hair while the hair is wet and retaining it in a desired position while it is allowed to dry so that it will semipermanently retain the curves and curls which are placed in it while in a damp state."

Plaintiff contends that the examiner was aware that setting hair with tape was old. It is evident, however, that the examiner had no such awareness. In the first office action taken on the initial application, the examiner rejected the claims because they were "indefinite since pressure sensitive adhesive exists on only one side of the elongated tape, [and therefore] insufficient structure has been recited to substantiate 'adhered to both the skin and hair.'" It thus appears that the examiner believed the tape was placed between the skin and the hair and needed adhesive on both sides of the tape.

Further, there is not a scintilla of evidence that plaintiff did anything to advise the examiner as to the prior art. Indeed, plaintiff, through his attorneys, informed the patent office in 1968 that,

"While tape may be used today to retain hair in hair setting such use was not . . . obvious in 1965 when the present application was filed . . . .. Further, the art cited in no way anticipates or makes it obvious to one skilled in the art to utilize the present inventive method *even without perforated tape* . . .."

It is apparent, as the district court found, that the patent office did not consider the prior art of using non-porous tape in connection with hair styling.

The patent office issued patent No. 3,464,424 to plaintiff on September 2, 1969. The patent describes 3M's "Micropore" tape as the preferred tape for use in the patented method, and the only basis for the patent is the claim that the method constitutes "a new use of a known composition . . .." As the district court noted, "The properties of porosity, non-irritability and painless removal from the skin were known properties of defendant's MICROPORE tape. They were improvements in tape provided by defendant and were not the discovery of the plaintiff."

After considering the great quantity of evidence before him, the district judge reached the following conclusion:

"Plaintiff's Patent No. 3,464,424 in suit is *unenforceable* because of the inequitable conduct of plaintiff's attorneys in failing to bring to the attention of the Patent Office, during the prosecution of the patent applications which led to the patent in suit, the prior art most material and relevant to the subject matter claimed and misleading the examiner as to the existence of such art, ignorance of such art on the part of the Patent Office examiner being the primary cause for the allowance of the patent in suit." (Emphasis added.)

If sustained, this conclusion would obviate the necessity of considering the anticipation or obviousness issues raised by plaintiff or the infringement question presented by the cross-appeal.

■ The grounds stated by the district court for the above conclusion are findings of fact which "[o]n appeal in a patent case, as in other cases tried by the District Judge without a jury, this Court is required to accept . . . unless they are clearly erroneous." *Erickson Tool Co. v. Balas Collet Co.*, 404 F.2d 35, 36 (6th Cir. 1968). Upon examination of the record, we conclude that the district court's findings of fact in this regard are not clearly erroneous. The question as to whether the district court correctly held that this conduct rendered the patent unenforceable is a question of law reviewable as such.

■ The "uncompromising duty" to disclose material prior art owed by a patent applicant in the prosecution stage before the patent office was extensively discussed by this court in *Charles Pfizer & Co. v. FTC*, 401 F.2d 574 (6th Cir. 1968).

"Obligation of Parties in Patent Office Proceedings

"The Patent Office, not having testing facilities of its own, must rely upon information furnished by applicants and their attorneys. Pfizer and Cyanimid, like all other applicants, stood before the Patent Office in a confidential relationship and owed the obligation of frank and truthful disclosure.

"In *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123, the Supreme Court quoted with approval the following:

By reason of the nature of an application for patent the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to applicants, the Office * * * must rely upon their integrity and deal with them in a spirit of trust and confidence * * *.

"In *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381, the Court said:

Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue. * * * Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies." 401 F.2d at 579.

Further, the Supreme Court has made it clear that federal courts may, under their traditional equitable power, deny infringement relief to a patentee who has behaved unethically in his dealings with the patent office. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 722, 64 S.Ct. 1281, 88 L.Ed. 1596 (1944). This remedy has been applied or at least recognized by many other courts. *E. g., Kahn v. Dynamics Corp. of America,* 508 F.2d 939 (2d Cir. 1975); *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 443 F.2d 867, 881 (2d Cir. 1971); *Beckman Instruments, Inc. v. Chemtronics, Inc.,* 428 F.2d 555, 565- 566 and 439 F.2d 1369, 1379–1380 (5th Cir. 1970), *cert. denied,* 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1971); *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 394 (10th Cir. 1965); *Admiral Corp. v. Zenith Radio Corp.,* 296 F.2d 708, 716 (10th Cir. 1961).

█ We conclude, as did the district court, that the plaintiff's failure to disclose clearly material prior art, plus the false assertion that no such art existed, constituted inequitable conduct before the patent office and rendered the patent unenforceable.

Although we need not reach the novelty or obviousness issues presented, we observe that the record contains ample evidence that, if believed, would show that plaintiff's patented method was neither novel nor non-obvious.

For the reasons stated hereinabove, the judgment of the district court in favor of 3M is affirmed.