**STEWART–WARNER CORPORATION, Plaintiff-Appellant, Cross-Appellee,**

v.

**The CITY OF PONTIAC, MICHIGAN, and American Sign & Indicator Corporation, Defendants-Appellees, Cross-Appellants.**

Nos. 81–1611, 81–1631.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1983.

Decided Sept. 2, 1983.

Alfonse J. D'Amico, Barnes, Kisselle, Raisch & Choate, Detroit, Mich., Melvin M. Goldenberg (argued), McDougall, Hersh & Scott, Chicago, Ill., for plaintiff-appellant, cross-appellee.

William J. Coughlin, Harness, Dickey & Pierce, Birmingham, Mich., William L. Anthony, Jr. (argued), Palo Alto, Cal., for defendants-appellees, cross-appellants.

Before MERRITT, KENNEDY and MARTIN, Circuit Judges.

MERRITT, Circuit Judge.

Plaintiff appeals from the District Court's judgment granting defendants' motion for directed verdict in this infringement suit involving two patents for large stadium scoreboards with matrices of light bulbs displaying moving images. The essential holding of the District Court was that the plaintiff lost its patent monopoly over the two inventions because it put the invention on the market more than a year before its two patent applications were filed. We agree with the District Court as to the first patent but disagree as to the second.

Stewart-Warner Corporation sued the City of Pontiac, Michigan and American Sign and Indicator Corporation ("American Sign") claiming that the defendants had infringed two of its patents, known as the '335 and '926 patents, by constructing a scoreboard at the Pontiac Silverdome. Pontiac and American Sign defended by seeking to have the patents declared invalid, unenforceable or not infringed. At the close of plaintiff's case, defendants moved for dismissal under Rule 41(b), Fed.R.Civ.P., on the grounds that on the facts and the law, Stewart-Warner was not entitled to relief. The motion raised the same issues which we must now address on appeal:

(1) Whether the '335 patent was "on sale" in the form of Stewart-Warner's Kansas City Scoreboard "for more than one year" before the patent application was filed and thus is invalid under 35 U.S.C. § 102(b).

(2) Whether the '926 patent is invalid as anticipated by Stewart-Warner's previous scoreboard installation, and thus also effectively on sale more than a year before the patent application was filed.

After defendants' motion, the trial judge severed the 102(b) issues from the rest of the trial, and heard additional evidence from Stewart-Warner directed solely to those issues. After argument, the judge rendered two opinions from the bench, holding both of Stewart-Warner's patents invalid under 102(b). In this appeal, we consider only the issues set forth above. We express no opinion on the issues of obviousness or infringement that were not reached by the court below.

The invention that Stewart-Warner has patented is a scoreboard display system for use primarily in sports arenas. The goal of the system is to display on stadium scoreboards a moving video image of a quality equivalent to that seen on a black and white television screen. The system has the capacity to receive moving photographic or video light signals and transform them into signals which display a likeness of the video image on a scoreboard consisting of a large matrix of light bulbs.

The system can receive video signals from a variety of different sources including video cameras, television broadcast signals, and video disc or tape memory. The video signal is formed by a camera repeatedly scanning its subject at a high rate of speed. The signal is an irregularly curved line, whose height at any point represents the intensity of light received by the camera at a particular instant in time during its scan.

The first part of the system, known as a "video-to-digital converter," takes a reading

of the video signal in time frames representing millisecond intervals on the scan, and analyzes the light intensity at that particular point. In the case of the '335 patent, the video time frame will be assigned one of four light intensity values. This information is converted into digital information bits—each of the four levels of light intensity being assigned a binary value—capable of being fed into a computer. Along with each digital light intensity value, the computer receives "addressing" information so that the correct intensity can be transmitted to the proper location on the matrix of light bulbs. Each light bulb has a separate address on the scoreboard.

After the video image is converted to digital values, this encoded digital information is fed into a data processor, which is not part of the invention claimed here. The computer stores the information at a place in the memory corresponding to a particular scoreboard address, and provides the necessary synchronization of the process.

The remaining problem Stewart-Warner had to solve was how to use the digital signal to turn on different light bulbs to produce varying "shades of grey" in order to give the impression of a black and white television picture. Prior systems only signaled a bulb to turn on and stay on until an "off" signal with the same address was received. Achieving varying shades of intensity requires that a switch-like device called a "triac" be programmed to turn the light bulbs on and off rapidly, giving the human eye the impression of a constant source of varying light intensity. Since alternating current flows in cycles of a tiny fraction of a second, the bulb must be turned on for a portion of each cycle in order to obtain this effect. To achieve four shades of grey, the circuitry must be designed to turn the light bulbs on and off at intervals of a full cycle, a half cycle, one-quarter cycle, or not at all.

The display board itself is a large matrix of rows and columns of incandescent bulbs. In the particular scoreboard at issue here, there are 16,200 bulbs in the matrix, divided into 15 modules. The size and arrangement

of the board can be varied by design, and the use of such a matrix is not new to this invention.

The '926 patent at issue here describes a similar scoreboard system. The only difference in result is that it projects images in eight or more shades of grey instead of four, creating a higher quality picture. The video to digital converter of the '335 patent could produce sufficient digital data to create eight shades of grey. But the computer-to-scoreboard circuitry had to be changed and improved to process the data fast enough to light the light bulbs for eight or more different fractions of the alternating current cycle in order to create eight or more shades of grey.

## I. The '335 Patent and the "On Sale" Bar

The statute that the District Court construed in finding the '335 patent invalid, 35 U.S.C. § 102(b) provides, in pertinent part:

A person shall be entitled to a patent unless—

.　　.　　.　　.　　.

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or *on sale* in this country, more than one year prior to the date of the application for patent in the United States ... (emphasis supplied).

Stewart-Warner filed applications for its '335 patent on August 9, 1973. The critical question is thus whether the scoreboard which Stewart-Warner installed in the Kansas City stadium was "on sale" prior to August 9, 1972.

■ In this Circuit, a party challenging the validity of a patent based on the statutory bar of 102(b) carries the burden of making a *prima facie* showing that the invention was on sale by clear and convincing evidence. Once such a showing is made, the burden shifts to the patentee to prove that the device was not on sale because it was not functionally operative, or because it was used only for testing purposes. *FMC Corp. v. Myers,* 384 F.2d 4 (6th Cir.1967), cert.

denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968).

In order to carry its burden of proving that an invention was "on sale" one year prior to the patent application, a party must establish that as of the critical date there existed (1) an offer or contract for sale of (2) a completed device which (3) embodies the invention claimed in the patent. *CTS Corp. v. Piher International Corp.*, 527 F.2d 95 (7th Cir.1975); *Timely Products Corp. v. Arron*, 523 F.2d 288 (2d Cir.1975). The parties agreed at trial that Stewart-Warner had contracted with the Kansas City Chiefs to construct the scoreboard in November, 1981. Thus the first part of the test is satisfied. Nor is there any dispute over the third factor—that the scoreboard at issue embodies the claims in the '335 patent. The major question at trial, which we must now consider, is whether the device embodying the invention was completed prior to the critical date, August 9, 1972.

The "on sale" bar of 102(b) reflects the congressional intent to further the public interest in disclosure of useful knowledge without unduly hampering the inventor's interest in fully developing an idea before being required to patent it. *See New Guidelines for Applying the On Sale Bar to Patentability*, 24 STAN.L.REV. 730, 732–35 (1972). The decision to give an inventor one year to apply for a patent after he completes his invention was seen as the best way to accommodate these interests. Id. at 736. In attempting to define the point at which an invention is complete, courts have struggled to develop a legal standard which balances the interests articulated by Congress. *See, e.g., Timely Products, supra* at 299–302 and cases cited therein.

The most widely used standard today for determining when an invention is completed under section 102(b) is the "reduction to practice" standard. *See, e.g., Digital Equipment v. Diamond*, 653 F.2d 701 (1st Cir.1981); *CTS Corp., supra; Timely Products, supra; In Re Yarn Processing Litigation*, 498 F.2d 271 (5th Cir.1974). *See also, General Electric Co. v. United States*, 654 F.2d 55 (Ct.Cl.1981) (recognizing split in authority on the issue of whether reduction to practice is required to trigger the on sale bar). This is the same standard used for determining priority of patents.

Although judicial pronouncements about what constitutes a reduction to practice vary slightly from court to court, most articulate a standard similar to that outlined by the Court of Customs and Patent Appeals over the years:

> To constitute an actual reduction to practice of a machine, the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. Unless the device is of such a nature that by its very simplicity its practical operativeness is manifest, the machine must be tested under actual working conditions in such a way as to demonstrate its practical utility for its intended purpose, beyond probability of failure. Actual performance is required of the function for which the machine is intended, with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful.

*Field v. Knowles*, 183 F.2d 593 (C.C.P.A. 1950) (citations omitted), *quoted in Ajem Laboratories v. C.M. Ladd Co.*, 424 F.2d 1124 (6th Cir.1970).

This Circuit has not previously adopted the reduction to practice test in connection with the section 102(b) defense. In *Ajem Laboratories v. C.M. Ladd, supra*, this Court "assumed without deciding" that a reduction to practice must be proved to trigger the on sale bar and applied the above-quoted test from the Court of Customs and Patent Appeals. Several well-reasoned opinions by district judges in this Circuit, including that of Judge Gilmore below addressing the validity of the '335 patent, have used this standard in section 102(b) cases. *See Ex-Cell-O Corp. v. Litton Ind. Products, Inc.*, 479 F.Supp. 671, 683 (E.D.Mich.1979). We believe that the reduction to practice standard in section 102(b) cases provides a coherent test for

completion which accommodates the interests of both the inventor and the public, and we accordingly adopt it as the law of the Sixth Circuit.

At trial before Judge Gilmore, extensive evidence was introduced on the question whether the Kansas City scoreboard had been reduced to practice prior to the critical date. The evidence primarily concerned two sets of tests conducted by Stewart-Warner on the scoreboard, one at its Chicago plant (the "parking lot" tests) and another at the Kansas City stadium.

■ The parking lot tests occurred in May, 1972, prior to the time Stewart-Warner shipped the scoreboard to the stadium. The evidence showed that the entire system from video camera to scoreboard matrix was hooked up in the parking lot of the Stewart-Warner plant.[1] Only one or two modules of the scoreboard were connected to the system, however. The video camera was focused on an exit sign, smoke rings, a large crane, and several different people. Without hooking up all the modules, only a partial image could be displayed. But it is clear that recognizable moving video images in four "shades of grey" were shown on the scoreboard in Chicago. As many as five modules were hooked together at one time but only a video test pattern was displayed on them. In addition, the stadium conditions were simulated in the parking lot by moving the scoreboard from sunlight to shade and testing it with the sun at various angles in the sky. The tests were considered quite successful by Stewart-Warner personnel.

In June, the scoreboard was shipped to Kansas City for erection in the stadium. There were some delays upon arrival, but by the first week in August, the system was completely put together except for completing the computer program itself. There was clear evidence that video images were displayed on the scoreboard in four shades of grey prior to August 9, but the testimony conflicts on whether moving images were displayed prior to that time.

In his oral opinion, the District Judge chose to credit the testimony of several people, two of whom were unconnected with either party to the case, that moving video images in four shades of grey were displayed on the scoreboard before August 9. He held that the Kansas City scoreboard was reduced to practice by the Chicago parking lot tests in May, 1972, but assuming *arguendo* that those tests did not constitute a reduction to practice, he held that the scoreboard was reduced to practice in Kansas City prior to August 9.

■ We have some question about the correctness of the District Judge's holding that the scoreboard was reduced to practice by the Chicago parking lot tests. In some cases, courts have found a reduction to practice where only laboratory or simulated working conditions tests were conducted. *See, e.g., Dart Industries v. E. I. Dupont de Nemours,* 489 F.2d 1359 (7th Cir.1973) (laboratory tests sufficient); *General Electric Co. v. U.S.,* 654 F.2d 55, 64 (Ct.Cl.1981) (fact that certain tests were not run does not prove a lack of reduction to practice where the tests related to customer's intended use, not to the invention's operability). The parking lot tests demonstrated that it was possible to transform video action to moving images on a matrix of light bulbs in varying light intensities. But the law requires that the device embodying the invention be tested sufficiently to demonstrate a quality of operation which shows its *utility in its intended environment. Ajem Laboratories, supra, citing Fields v. Knowles, supra.* It is a close question whether a system as novel and complex as this scoreboard could be said to be reduced to practice prior to being completely assembled in the stadium where it was to be used.

■ We do not have to decide this question, however, because the District Judge

1. In none of the tests was the computer program perfected; the necessary programming had to be "toggled in" by Stewart-Warner engineers. Since the computer program was not patented, the absence of a completed program does not affect the "completion" of the invention.

was clearly correct in holding that the scoreboard system was reduced to practice at Kansas City prior to August 9, 1972. Under any definition of reduction to practice we have found, the scoreboard was completed when it was totally assembled at the stadium and showed moving video images in four shades of grey. At that point, its utility for its intended purpose in its contemplated environment was established. Stewart-Warner does not contest this point. The only real issue before the trial judge was one of fact: did the defendants show by clear and convincing evidence that the reduction to practice occurred before August 9? The judge so found after a full evidentiary hearing, and this Court will reverse such a finding only if it was clearly erroneous. *Buzzelli v. Minnesota Mining & Mfg. Co.*, 521 F.2d 1162 (6th Cir.1975).

■ Stewart-Warner argues that conflicting evidence cannot satisfy the clear and convincing standard, and thus Judge Gilmore's determination *was* clearly erroneous. We disagree. The weight of the evidence supported his finding, and the weight and credibility to be given testimony is within the province of the trial judge. William Harmon, who worked for the Kansas City Chiefs, testified based on written records that moving images were shown on the scoreboard *prior to* the press review of August 9. (DX 133 p. 31) Another independent witness, James Pilley, Director of the Jackson County Sports Authority, recollected seeing a moving image of a particular person on August 7. (DX 138 p. 37) Jackson County Judge Lehr, the person whose image Pilley had seen, corroborated this testimony. (DX 44) One present and one former employee of Stewart-Warner even testified to seeing moving images early in the week. Kenneth Latham said he saw moving images four or five days before the August 12 opening. (DX 134) Ralph Ravenesi said it occurred more than one day prior to the August 9 media demonstration. (DX 139) Stewart-Warner relies for its view of the facts on the testimony of one of its engineers, a different interpretation of the meaning of Judge Lehr's testimony, and

challenges to the credibility of the defendants' witnesses.

■ There was ample evidence to support the determination that the defendants made a clear and convincing showing of reduction to practice under the applicable legal standard. Accordingly, we affirm the District Court's decision holding the '335 patent invalid.

## II. The '926 Patent

The District Judge also held Stewart-Warner's '926 patent, describing a scoreboard capable of eight shades of grey, invalid under the "on sale" bar of section 102(b). He held in effect that the claim stated in element h of the '926 patent was not significantly different from the embodiment of the '335 patent found in the Kansas City scoreboard. He concluded that the Kansas City scoreboard installation, which was undisputably on sale more than one year prior to the '926 patent application, fully anticipated the '926 patent. Although this is a close case with difficult technological and legal issues, we believe that the '926 patent is different from the '335 patent and the Kansas City scoreboard, sufficiently different to convince us that the District Court erred in concluding that it was fully anticipated.

Counsel for defendants do not deny that the Kansas City scoreboard system was incapable of producing images with more than four shades of grey. Counsel for plaintiff admitted to the District Judge during final argument that all of the '926 patent claims except the preamble and subpart h of claim 1, read on the '335 patent. (J.A. at 712) Thus, the conflict at trial was narrowed to the question of the proper interpretation to be given to specific portions of Claim 1 in the '926 patent which read as follows:

A system for displaying images on a plurality of visual display devices operated by application of a periodic power waveform, including means for applying said periodic power waveform to said system, said display devices arranged in modules to form a full display matrix capable of

at least eight levels of light intensity comprising. . . .

h. clock means for operating said extracting means, transmitting means, decoding means and applying means on a real time basis at a data transmission rate sufficiently greater than the frequency of the periodic power waveform that said applying means completely applies the decoded intensity level information to the selected display devices during the occurrence of each power waveform interval whereby each display device is energized at the proper interval on the power waveform to accurately reproduce the applied intensity information.

The District Court found that this portion of the claims simply described the '335 patent and claimed nothing new. The language of the preamble reciting eight levels of light intensity is said to refer only to the capacity of the scoreboard matrix itself, not the entire system. Thus interpreted, it reads on the Kansas City scoreboard because that matrix was also inherently capable of eight or more levels of light intensity. Further, the reference to eight shades in the preamble was only a statement of desired result, and thus could not be used to limit or modify element h. Element h, standing by itself, was also anticipated by the Kansas City scoreboard.

The District Judge based these findings entirely on a small excerpt from the deposition testimony of Dr. Robert Payne, an expert witness for Stewart-Warner, who in response to a question, agreed that the Kansas City scoreboard system possessed means for sending data fast enough to transmit the light intensity information to the scoreboard and apply it to the proper lamps during the required interval. Because the question posed to Dr. Payne in regard to the Kansas City system used language similar to that of element h in the '926 patent, the District Judge held that the latter read on the former. For three reasons, we believe this conclusion, though plausible, is based on an overly narrow

reading of the testimony and of the law governing patent validity.

First, the District Judge seems to have failed to consider a basic procedural rule of patent law: "A patent shall be presumed valid." 35 U.S.C. § 282 (1954). The presumption of validity is based upon the "acknowledged experience and expertise of the Patent Office and upon the fact that the issuance of a patent constitutes a type of administrative determination supported by evidence." *American Seating Co. v. National Seating Co.,* 586 F.2d 611, 615 (6th Cir.1978). The presumption is greatly strengthened where the most pertinent prior art has been considered by the Patent Office. *Bolkcom v. Carborundum Co.,* 523 F.2d 492 (6th Cir.1975).

We believe that the Patent Office considered the '335 patent and the Kansas City scoreboard in issuing the '926 patent. A close examination of the file wrappers of the two patents at issue here reveals that they were both pending in the Patent Office over almost a two year period; the '335 application was filed in August, 1973 and granted in February, 1977 and the '926 application was filed in April, 1974 and granted in March, 1976. The specifications of the '926 patent mention the '335 application several times. Although the primary examiners listed on the two patents are different, an assistant examiner named John Godfrey worked extensively with both patents over a period of at least a year and a half, rejecting claims, allowing amendments and meeting with the applicants on both patents. In final argument on the '926 patent, counsel for Stewart-Warner told the judge that at the meeting with Mr. Godfrey on the '335 patent, he was shown a film of the Kansas City scoreboard in operation, making him aware of the prior art installed in Kansas City as well as the '335 patent. (J.A. at 715)

We agree with Judge Kennedy in her dissenting opinion that the existence or nonexistence of the presumption is important in this case; and it is true, as Judge Kennedy points out, that the Patent Office did not explicitly cite the Kansas City score-

board as prior art when it granted the '926 patent. But since the '335 patent had not yet been granted, it could not have appeared in the prior art references found at the beginning of a patent. The presumption of validity exists when the prior art is cited *or considered* by the patent office. *See* 4 Deller's Walker on Patents § 261 (2d ed. 1965). Where, as here, the issue is a close one and involves complex questions of technology particularly within the expertise of the Patent Office, the existence of a presumption of validity is important. The patent examiner obviously found that the '926 patent constituted a patentable advance over the '335 patent, the prior art applied in the Kansas City scoreboard, which he saw pictures of in the meeting with plaintiffs. The examiner's issuance of two separate patents in this situation places the burden of overcoming a presumption of validity on the challengers, Pontiac and American Sign. The District Court apparently did not consider this presumption in connection with the '926 patent.

■ Second, the District Judge relied too heavily and strictly on the often-quoted rule of patent law that "the claims measure the invention." *Kaiser Industries Corp. v. McLouth Steel Corp.,* 400 F.2d 36 (6th Cir. 1968). In doing so, he did not consider the equally important rule: patent claims are to be interpreted "in the light of the specifications and both are to be read with a view to ascertaining the invention." *Olympic Fastening Systems, Inc. v. Textron, Inc.,* 504 F.2d 609 (6th Cir.1974), *quoting from United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). These two principles are not irreconcilable. The specifications are not to be used to expand the claims to cover advances clearly not claimed, but they should be considered to explain ambiguous claims or to limit overbroad claims. Although the invention on which a patentee is entitled to claim a monopoly is strictly limited to that which is properly disclosed in the file wrapper, overly technical interpretation of claim language is disfavored:

Patents are to be liberally construed so as to secure to an inventor the real invention which he intends to secure by his patent, and the specification may be referred to in order to explain any ambiguity in the claim and to limit the claim, but the specification is never available to expand the claim. The claims must be read in the light of the disclosure ... to grasp the invention in order properly to measure the range of equivalents.... [T]he claims whenever possible are to be construed so as to cover the real invention as found in the specification and drawings, and this is particularly so in the case of a meritorious invention.

4 Deller's Walker on Patents § 246 (2d ed. 1965). The District Judge apparently did not look at any portion of the file wrapper other than the isolated parts of Claim 1.

The narrow question the District Court was required to consider below was whether the Kansas City scoreboard *anticipated* the '926 patent. No issue of novelty was before him at this stage of the proceedings. The test for anticipation in this Circuit is whether "all the elements of the patent, doing substantially the same work in the same way are found in a single prior art structure." *Dunlop Company, Ltd. v. Kelsey Hayes Co.,* 484 F.2d 407, 414 (6th Cir. 1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1979). No one contests the fact that the '926 patent envisioned a scoreboard using very different electronic circuitry, resulting in the production of a much higher quality image than the Kansas City scoreboard. The issue is whether Stewart-Warner used the proper language in its patent application to claim this achievement—whether the '926 patent is sufficiently clear in describing the improvement over the '335 patent to avoid a finding that it reads entirely on the '335 patent. Strict rules of patent interpretation are important to the integrity of the patent system. Nevertheless the District Court's interpretation, which reads element h of Claim 1 without regard to the specifications, seems to us to deprive the inventor of his real invention. It does not "liberally construe" the patent to secure the invention

of this novel electronic circuitry to its inventor.

It is proper to construe element h in light of the specifications because to do so does not alter or expand what is claimed, but rather explains it. Element h claims the "means" for transmitting data at a fast enough rate to address completely all the lightbulbs on the display board during the desired time interval. The specifications explain the structure and materials used to provide the necessary means; they do not add a new element which is not found in the claims. Claims phrased in terms of "means" such as that used in the '926 patent are common, and could always be subject to a challenge for specificity if not construed to be limited to the structure recited in the specifications. Indeed, several courts have approved such a construction of "means" claims. *See Technitrol, Inc. v. Control Data Corp.,* 550 F.2d 992 (4th Cir. 1977); *Hale Fire Pump Co. v. Tokai Ltd.,* 67 Cust & Pat.App. 121, 614 F.2d 1278 (1980).

█ When we consider element h in light of the specifications it is clear that the Kansas City scoreboard did not anticipate the invention disclosed by the '926 patent. Element h of Claim 1 claims a method to transmit the light intensity data from the computer to the scoreboard at a sufficiently rapid rate to completely address the lamps during a given interval. The Kansas City scoreboard also had to address the lamps completely. However, the specifications make clear that the '926 patent uses a much different method of transmitting the data than the Kansas City scoreboard.

The scoreboards illustrated in both the '335 and '926 patents use a three-phase power supply, with each phase responsible for lighting one-third of the lightbulbs on the display matrix. The number of electrical pulses that must be transmitted during each half-cycle of the power wave form corresponds to the number of shades of grey to be displayed on the scoreboard. In the '335 patent, the computer has a serial memory—memory space is shared by all three phases. When the '335 system was used to attempt to transmit eight shades of

grey, there was insufficient time to transmit the pulses during each half-cycle, and an overlap between phases occurred, resulting in some data intended for light bulbs of one phase being addressed to light bulbs of the next phase. The '926 patent provides for the separation of the data for each phase in the memory and transmission of the shades of grey pulses on separate channels. Once the data is separated, and the problem of overlap eliminated, the system becomes expandable to accommodate more than eight shades of grey. The Kansas City circuitry was not so adaptable.

Third, the District Judge also did not consider the preamble to Claim 1 as a limitation on element h. The question of when a preamble limits the body of the claim was first discussed in the case of *Kropa v. Robie,* 38 Cust. & Pat.App. 858, 187 F.2d 150 (1951). The rule to be distilled from that case was stated by the Fourth Circuit in *Marston v. J.C. Penney Co.,* 353 F.2d 976, 986 (4th Cir.1965):

> If the preamble merely states a purpose or intended use and the remainder of the claim completely defines the invention independent of the preamble, it is not a limitation on the claims. On the other hand, if the claim cannot be read independently of the preamble and the preamble must be read to give meaning to the claim or is essential to point out the invention, it constitutes a limitation upon the claim.

The District Judge held that the preamble merely stated an intended result and was therefore not a limitation on element h. It seems to us, however, that the preamble is necessary "to give meaning to the claim" and "is essential to point out the invention," because it points out the eight shades capability of the proposed system. Considered together the preamble and element h claim a visual display system capable of supplying the information for eight shades of grey instead of the four shades displayed at Kansas City.

█ In short, a proper reading of element h of the '926 patent, in light of the

preamble and the specifications, discloses novel circuitry which allows the display of a much higher quality image than was possible with the Kansas City system. The District Judge thus erred in holding the '926 patent anticipated and invalid at the close of Stewart-Warner's proof.

### III. Denial of Attorneys' Fees

The defendants have cross-appealed from the District Judge's denial of their request for attorneys' fees. Defendants requested that the trial judge award them attorneys' fees under 35 U.S.C. § 285 which provides that "in exceptional cases" the court may award attorneys' fees to the prevailing party. Defendants argued that this is an exceptional case under the meaning of the statute because Stewart-Warner withheld material information from the patent examiner about the on sale status of the Kansas City scoreboard. The District Court denied the request and we affirm that decision.

 The Sixth Circuit encourages the award of attorney's fees to the prevailing party in patent infringement litigation only where there has been a showing of fraud, malice, bad faith or similar unconscionable conduct. *Deyerle v. Wright Manufacturing Co.*, 496 F.2d 45 (6th Cir.1974). The District Judge found a clear dispute of law and fact as to the on sale defense on the record and no evidence of bad faith, malice or unconscionable conduct. The fact that some of the relevant details regarding the development of the Kansas City scoreboard disclosed at trial were not brought to the attention of the patent examiner does not constitute a showing of misconduct that could bring this case within the exception provided for in the statute.

In sum, we affirm the District Court's judgment that the U.S. Patent No. 4,009,-335 is invalid, and his denial of attorneys' fees. We reverse his judgment holding U.S. Patent No. 3,941,926 invalid and re-

mand for further proceedings consistent with this opinion.

CORNELIA G. KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I concur in full in the majority's opinion with respect to the '335 patent and the denial of attorney's fees. However, I would affirm the judgment of the District Court that the claims of the '926 patent are fully anticipated by the Kansas City scoreboard and are therefore barred under 35 U.S.C. § 102(b). I agree with most of the legal propositions stated by the majority. My disagreement is primarily with their application of those principles on three specific and dispositive points.

First, I cannot agree that the usual presumption of validity afforded by 25 U.S.C. § 282 is enhanced because the '335 and '926 patents were pending before the same examiner. The defendants' claim of anticipation is based on the Kansas City scoreboard itself not the '335 patent. This actual device was not cited as prior art in the plaintiff's application for the '926 patent. Admittedly, the patent examiner had in the file wrapper for the '335 patent schematic diagrams of portions of the Kansas City scoreboard. The important point, however, is that the examiner did not cite the Kansas City scoreboard as prior art. Thus, we do not know if he considered the diagrams included in the '335 file wrapper much less the Kansas City scoreboard in relation to the '926 patent.[1] In *Park-Ohio Industries, Inc. v. Letica Corporation,* 617 F.2d 450, 453–54 (6th Cir.1980), this Court held that:

> [T]he failure of the examiner, Hall, who was also the examiner for the Bardell patent, to cite such highly relevant prior art as Bardell and Hurtt in the patent file history seriously weakens this presumption. *See Reynolds Metals Co. v. Acorn Bldg. Components, Inc.,* 548 F.2d 155, 160 (6th Cir.1977); *Bolkcom v. Carborundum Co.,* 523 F.2d 492, 498 (6th

1. Seeing a movie of the Kansas City scoreboard in operation would not alert the examiner that it may anticipate the '926 patent.

Cir.), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1975); *Schnadig Corp. v. Gaines Mfg. Co.,* 494 F.2d 383, 390 (6th Cir.1974). I believe this principle to be equally applicable to the present case.[2]

My second disagreement with the majority concerns its use of the '926 specifications to distinguish that patent from the Kansas City scoreboard. The majority acknowledges that specifications may not be used to expand a patent's claims. The majority nevertheless reads the '926 patent "in light of" its specifications in order to distinguish it from the prior art embodied in the Kansas City scoreboard. In so doing, I believe that the majority has impermissibly *added* to the claims of the '926 patent. The rule is well stated in *Philips Industries, Inc. v. State Stove and Manufacturing Company, Inc.,* 522 F.2d 1137, 1140 (6th Cir.1975):

> Although the claims must be read in light of the specification, *see United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708 [713], 15 L.Ed.2d 572 (1966), specific elements, completely absent in the claims, *may not* be inferred by reference to the specification. This is particularly crucial where, as here, the elements not set forth in the claims are the linch-pin of patentability. (emphasis added)

Aside from the preamble there is nothing in the claims which addresses the invention now claimed, a *system* for displaying images capable of at least eight levels of light intensity. One should not have to go to the specifications to determine what is claimed. Indeed Stewart-Warner has vigorously and continually asserted that the preamble should be read as a limitation on element h, the element which is the invention. (Stewart-Warner does not contend that the other elements of the claim are new.)

*Olympic Fastening Systems, Inc. v. Textron, Inc.,* 504 F.2d 609 (6th Cir.1974), relied upon by the majority is distinguishable from the present case. In *Olympic,* the claim required that a blind head be pulled

"into and through" a tubular rivet. In determining whether a product infringed the patent claim the District Court held that language "through" meant "through and out of." Our Court reversed saying that examination of the specifications showed that "through" was not used in the strict sense of through and out but also included through to a predetermined distance which could be flush with the exposed rivet head. The Court was interpreting ambiguous language in the claim; it was not looking to the specification to find out the invention.

The preamble to the '926 patent may not, in my opinion, provide an element not found in the claims and needed in order to distinguish prior art. The District Court held that the preamble phrase "capable of at least eight levels of light intensity" only modified the display matrix also described in the preamble. On appeal the plaintiff has successfully argued that the '926 preamble should be incorporated into each paragraph of the '926 claim, and in particular into item 4. Plaintiff concedes that the language of the preamble would have to be modified from "full display matrix capable of at least eight levels of light intensity" to some language that the full *system* be capable of energizing the matrix with eight or more levels of light intensity. Plaintiff never states exactly how the claim as modified would read. Thus, the language of the preamble is at best ambiguous. In *Arshal v. United States,* 223 Ct.Cl. 179, 621 F.2d 421 (1980), the court held that where the words of the preamble are ambiguous "a compelling reason must exist before the language can be given weight." *Id.* 621 F.2d at 431. I believe that application of such a rule is appropriate to the present case.

I agree that

> [I]f the claim cannot be read independent of the preamble and the preamble must be read to give meaning to the claim or is essential to point out the invention, it constitutes a limitation upon the claim.

---

**2.** The majority states that since the '335 patent had not been granted, it could not have appeared in the prior art references. The District Court did not find that the '926 patent was anticipated by the '335 patent but by the scoreboard.

See *Kropa v. Robie,* 187 F.2d 150, 38 C.C.P.A. Patents 858 (U.S.Ct.P.A.1951). *Marston v. J.C. Penney Company,* 353 F.2d 976, 986 (4th Cir.1965). However, here the claims can be read independently of the preamble. Unfortunately, so read they read on prior art, the scoreboard. In *Marston,* the court refused to limit a patent's claim by the language of the preamble when so limited the accused article would not infringe. The preamble called for a flexible buoyant filler pad. The infringing chaise was neither buoyant nor a filler pad. The *Marston* court went on to hold:

> In the present case the preamble does not describe a unique article to which the claim alone is referable, cf. *Benoit v. Wadley Co.,* 54 F.2d 1041 (7 Cir.1932), and the preamble is not essential to a reading and understanding of the claim. The invention arises from the combination and arrangement of the various elements described in the claims and the portion of the claims following the preamble is a self-contained description of the invention.

*Id.* at 986. The same is true in the case at bar.

Accordingly, I dissent.