**AMERICAN SUNROOF
CORPORATION,
Plaintiff,**

v.

**CARS & CONCEPTS, INC., Defendant.**

Civ. A. No. 79–73213.

United States District Court,
E.D. Michigan, S.D.

June 29, 1984.

Arnold S. Weintraub, William M. Hanlon, Jr., Troy, Mich., for plaintiff.

Hugh L. Fisher, Irvin L. Groh, Birmingham, Mich., for defendant.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

This action was initiated on August 14, 1979 when Plaintiff, American Sun Roof Corporation [Sunroof], filed its Complaint, alleging that Defendant, Cars & Concepts, Inc. [C & C], had infringed its patent rights on a unique car accessory (namely, a roof cap). On September 11, 1979, C & C answered the Complaint, thus, joining the issue. The instant Motion for Summary Judgment was filed on April 2, 1984 by C & C. Sunroof responded on May 9, 1984 in opposition to the motion. C & C filed a reply on May 19, 1984 to Sunroof's response.

Local Rule 17(j) provides, in part, that "[o]ral hearings on ... motions [such as the one under consideration] shall be permitted unless the Judge at any time prior to the hearing orders their submission and determination without oral hearing on the briefs filed as required by this Rule." Inasmuch as an oral argument on the pending motion would not substantially facilitate a resolution of the dispute, this Court will (1) dispense with oral argument, and (2) make a determination of the issues on the basis of the pleadings and other documents which have been filed with the Court to date.

Sunroof claims that it initially conceived of the patent in suit in 1974 or early 1975. The roof cap, as it was applied to General Motors' Cadillacs (the eventual purchaser of the patent), was called the Biarritz Program. On or about February 4, 1976, Sunroof applied a prototype of its roof cap to a Cadillac Eldorado and demonstrated it to the Cadillac Motor Division for a review and suggestions. Sunroof and/or its branch, Automobile Specialty Corporation, gave some preliminary price quotes to Cadillac at this meeting on the basis of certain assumptions about the future final product.

Various communications between Cadillac Motors and Sunroof ensued. C & C has presented in the record a letter from Sunroof, dated February 7, 1976, in which Sunroof submitted revised quotations for the unit price of the Biarritz Program and the tooling that would be needed to produce the product. The record also reflects a Cadillac internal memorandum, the subject of which is a February 11, 1976 meeting. This memo indicates that the final concept of the Cadillac Eldorado was agreed upon by Cadillac at the February 4th meeting. The memo also reported that the Biarritz proposal was to be reviewed by its Sales Division who was then to make a recommendation to either approve or reject the program. Finally, the memo noted that the Sales Division recommended a production release of the Eldorado Biarritz Coupe. On March 12, 1976, a purchase order was issued by Cadillac "to cover the cost to prepare car # 6538 for photographic set-up required for the biarritz program." The order carried the following note: "Note: this work is complete." On March 24, 1976, a sales order was issued by Cadillac to cover the cost to prepare the Eldorado "Biarritz" tooling aid car for use by the G.M. Photographic. On March 29, 1976, a purchase order was issued to "cover the cost of modifying 1976 Eldorado Coupe's by the addition of a custom sewn, fully padded cabriolet vinyl ½ roof with ..." (i.e., the Biarritz Program). There was also a purchase order to cover the cost of necessary tooling for the Biarritz trim option on 1976 Eldorado sedans for $80,000.00.

Additionally, C & C submitted a letter, dated April 5, 1976, from Cadillac to all Cadillac dealers which announced the Biarritz option on the Eldorado Coupe. The letter indicated that production would begin in mid-April and that orders which seek to include this option should be submitted immediately. A price schedule was included in the letter. In their answers to interrogatories, Sunroof says that the invention was first reduced to practice in late 1974 or early 1975 and first offered for sale on March 5, 1976.

In its version of the facts, Sunroof states that Cadillac first reviewed the pre-production built Biarritz and required adjustment on April 27, 1976. Sunroof submits that Cadillac again inspected the production model on May 4, 1976, and requested further changes that were later incorporated. On May 2, 1977, Sunroof filed for a patent of the roof cap patent in suit which Cadillac called the Biarritz Program.

C & C cites the applicable law as set forth in 35 U.S.C. § 102(b):

A person shall be entitled to a patent unless—(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application in the United States.

Thus, C & C contends that, on the basis of the exhibits and depositions which have been presented with its motion, it has shown that the patent in suit was on sale prior to May 2, 1976, one year prior to the application for the patent.

C & C points out that under applicable law, an offer to sell is sufficient to satisfy the on-sale requirement of § 102(b), *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (C.A.F.C. 1983). Moreover, C & C argues that the "on sale" status may be found from activity of the inventor or his company in attempting to market the invention. This is because the inventor's loss of right to a patent flows from the attempt to profit from the invention by commerical exploitation of the invention beyond the grace period allowed by statute. As noted in *Red Cross Manufacturing Corp. v. Toro Sales Co.*, 525 F.2d 1135 (7th Cir. 1975) "the policy underlying the 'on sale' bar is to prevent an inventor from holding back the secrets of his invention from general public knowledge while at the same time exploiting it commercially, thereby extending the duration of his legal monopoly." Thus, C & C asserts, that a single public use or only a placing on sale is sufficient to invalidate a patent.

Moreover, C & C argues that since the invention was "reduced to practice" before the May 2, 1976 date, that is also evidence

that it was on sale, *Timely Products Corp. v. Arron*, 523 F.2d 288 (2d Cir.1975). C & C asserts that the patent in suit's inventor, Michael Alexander, testified in his deposition that the invention was reduced to practice in February 1976 and that the structure of the roof cap had actually been installed on a vehicle which was reviewed by Cadillac on February 11, 1976. C & C claims that Sunroof's interrogatory responses confirm that the invention was reduced to practice shortly after late 1974 or early 1975.

Further, C & C alleges that the exhibits referred to in the facts, along with depositions and affidavits support the conclusion that the invention was put on sale before May 2, 1976. C & C has submitted affidavits of Cadillac employees, Ernest Ashton and Thomas Flynn, both of whom say that it was Cadillac's practice to issue the purchase orders for a product and to announce a new option to its dealers only after the product was approved for production. It was their opinion that the Biarritz Program was approved for production before the dates of the purchase orders and the announcement (i.e., no later than late March or early April 1976). Also, C & C points to Sunroof's interrogatory answer which says that it put the invention on sale on March 5, 1976.

C & C claims that the invention was determined to be operable and sufficiently complete before the May 2, 1976 cutoff date. C & C posits that though there may have been some minor refinements and adjustments for commercial feasibility after May 2, 1976, this does not change the conclusion that the product was on sale before that date, thus invalidating the patent.

C & C cites *Barmag v. Murata Machinery, Ltd.*, 731 F.2d 831 (C.A.F.C.1984). C & C argues that the reasoning in *Barmag* applies to this case, and compels the same result as reached by the Court of Appeals there. Thus, an examination of the *Barmag* reasoning is in order. This is a case where the Court of Appeals for the Federal Circuit affirmed a grant of summary judgment which invalidated a patent under § 102(b) on the basis that it had been

"on sale" prior to the one year before patent application. The *Barmag* Court held that patent cases are just as amenable to summary judgment as any other case where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Barmag* noted that the "on sale" bar is to be applied where there has been a solicitation of an order for a specific article to be produced later, more than one year before the patent application. Thus, *Barmag's* argument [that only a "make-shift" model was actually produced and shown to the buyer before the applicable date] was found to be of no assistance to his denial of having the product "on sale." Moreover, the *Barmag* Court and the Court in *Timely Products v. Arron*, 523 F.2d 288 (2nd Cir.1975) rejected the "on hand" test which requires that "a device incorporating the invention must have existed in its ordinary or contemplated usable form, and must have been on hand and ready for delivery more than one year prior to the patent application filing date." Both courts opined that this rule produced results which are contrary to the basic underlying principles relating to the "on sale" bar of § 102(b) that are specifically designed to preclude commercial exploitation of an invention and effective expansion of the allowable period of exclusive rights. Since the *Barmag* Court noted that offers to sale may be made without the product on hand, the Court concluded that the on hand test was inappropriate.

The *Barmag* Court also noted that a court may properly draw inferences from the undisputed facts to make a legal conclusion that a product was "on sale." Thus, the Court noted that findings as to when an invention is put "on sale" and when it is reduced to practice are legal conclusions which can properly be made on a Motion for Summary Judgment.

In response to *Barmag's* argument [that the invention was not complete before the cutoff date], the Court noted that the *Timely Products* requirement (namely, that the product be complete) "can only mean that each element of the claim must be found in the embodiment or the invention as a whole must have been obvious

therefrom." Thus, the *Barmag* Court found that, since the claimed invention was embodied in the model which existed prior to the critical date, it was immaterial that the model was only a makeshift embodiment. Moreover, the Court held it immaterial that changes were made in the machine after the critical date since the changes were not changes in the claimed invention itself (i.e., not in the new idea).

*Barmag* also argued that tests of its invention prior to the cutoff date were insufficient to verify operability and commerical marketability of the product. Thus, Sunroof asserted that the *Timely Products* requirement of sufficient testing was not satisfied. However, the *Barmag* Court opined that there is no requirement of commercial marketability in addition to reduction to practice. Rather, the *Barmag* Court determined that, pursuant to *Timely Products*, an invention is "operable and commercially marketable" once the legal requirement of reduction to practice is satisfied. The *Barmag* Court noted that the reduction to practice standard requires that an invention be "sufficiently tested to demonstrate that it will work for its intended purpose." See *General Electric Co. v. U.S.*, 228 Ct.Cl. 192, 654 F.2d 55 (1981). Moreover, *Barmag* held that commercial marketability is not a requirement of reduction to practice so long as the invention "had utility in the sense of § 101." 35 U.S.C. § 101 reads: "Whosoever invents or discovers any new and useful process, machine, manufacture or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Thus, the Court of Appeals for the Federal Circuit approved the district court's conclusion that the invention had been reduced to practice. The appellate court concluded that the district court relied properly on the undisputed fact that a potential customer tested the machine, found it to produce a good product, and placed a ¾ million dollar order. Thus, the finding that the tested model had been reduced to practice was affirmed.

Finally, the *Barmag* Court rejected the Plaintiff's argument that the invention was in the experimental state until after the cutoff date. *Barmag* noted that the experimental exception applies only if the commercial exploitation is merely incidental to the primary purpose of experimentation to perfect the invention. When a patent holder wants to challenge an "on sale" bar, it is incumbent on that owner to produce evidence which would show an experimental purpose to the pre-cutoff date model. The burden is not on the challenger to the patent to present evidence which would negate, or attempt to negate, experimental use as part of its "on sale" argument, reasoned the *Barmag* Court. For all these reasons, the *Barmag* Court upheld the invalidation of the patent.

Sunroof contends that (1) the development of the product was still in progress after May 2, 1976, and (2) prior to that date, it was still in the experimental stages. Thus, it is Sunroof's position that its actions fall within the experimental use exception of § 102(b). See *In Re Yarn Processing*, 498 F.2d 271 (5th Cir.1974). Sunroof says that, since it was attempting to develop a product which was satisfactory for GM to market, the product was not "complete" or out of the experimental stage until it was clear that the product would be commercially acceptable to GM. Thus, in this case, GM wanted assurances (after it had approved the general concept of Sunroof's invention) that the Biarritz Program could be manufactured by assembly line techniques. Sunroof asserts that the amenability of the product to assembly line production had not been shown on the basis of the February 4, 1976 "mock-up." Sunroof submits that its Exhibits I and J demonstrate that the invention described in those purchase orders was merely experimental. [Parenthetically, it should be noted that no designation on these purchase orders of "experimental" can be found, although Plaintiff could be referring to the fact that the work "prototype" is checked on one of the order sheets]. Sunroof asserts that, in order to see if the product could be produced on the assembly line, it was necessary for Cadillac to set up a production line and to acquire the neces-

sary tooling. As such, Sunroof says that the commitment of $80,000.00 for the tooling of the Biarritz production does not mean that Cadillac had made a commitment to purchase the invention. In support of this proposition, Sunroof tendered the deposition of Cadillac employee, Heinz Pretcher, who stated that the tooling was ordered only to "hedge their bet" in the event of a decision by GM to buy the final product.

Sunroof says, in an apparent attempt to explain the order of Biarritz packages by Cadillac pre-May 2, 1976, that once the production line is set up, a "relatively small pilot or 'pre-production' run of vehicles is passed through the line and submitted for inspection. Sunroof says that the first pilot car was put through the production line on April 28, 1976 and that several corrections were required. The car was resubmitted for review on May 4, 1976 which Plaintiff posits, further evidences the non-completion of the product before the cutoff date.

Sunroof argues that, under *Stewart Warner v. Pontiac*, 219 U.S.P.Q. 1162 (6th Cir.1983), a device is not actually reduced to practice unless it is "completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use ... the machine must be tested under actual working conditions in such a way as to demonstrate its practical utility for its intended purpose, beyond probability of failure." Sunroof notes that the *Stewart Warner* Court heavily relied upon the *Timely Products v. Arron* decision.

Sunroof notes that the *Timely Products* Court, while rejecting the "on hand" test, indicated that the test might be applicable in a situation involving a "tailor made" product. Sunroof argues that its invention was tailor made to the Cadillac motor vehicle and that the "on hand" test should be applied. Thus, Sunroof says that since there was not a product completely acceptable to Cadillac (GM) until after the cutoff date, there was not a model of the product on hand until after that date. In this connection, Sunroof refers to *McCreery Engineering v. Massachusetts Fan Co.*, 195 F.

498 (5th Cir.1912) for its holding that mere plans to construct and deliver "a machine or manufacture not proven to have been previously completely falls short of proof that the machine or invention was on sale." Sunroof also cites *Trico Products Corp. v. Delman*, 199 F.Supp. 231 (D.C.Iowa 1961) for the proposition that:

> Where a specimen of an invention is built or made to order, it is not "on sale" until it is completed, delivered, and accepted.

Sunroof concludes that the form of the invention that existed prior to May 2, 1976 was not completed or fully accepted by GM, but rather it was made for experimental purposes and, thus, not "on sale" within the meaning of Section 102(b).

Both parties agree that the major case on the issues, which have been presented by the pending Motion for Summary Judgment is *Timely Products v. Arron*, which sets forth three criteria for determining when a product is on sale: (1) the complete invention claimed must have been embodied in or obvious in view of the thing offered for sale, (2) the invention must have been tested to sufficiently verify that it is operable and commercially marketable, i.e., that means that the invention must have been reduced to practice, and (3) the sale must be primarily for profit rather than for experimental purposes. The *Timely Products* Court rejected the "on hand" test. Sunroof's argument that the on hand test should be applied here because its product was "tailor made" is without merit. While recognizing that another Court, in *Philco v. Admiral*, 199 F.Supp. 797 (D.Del.1961) noted (in dicta) the existence of an exception to the "on hand" test, the *Timely Products* Court declined to accept the *Philco* exception, and rejected the "on hand" rule in toto, as contrary to the policy of the patent laws.

Plaintiff's argument that it had only an experimental product prior to May 2, 1976 is also without merit. As noted in *Timely Products* and *In re Yarn, supra*, the experimental exception only applies where the primary purpose of the experimenting to determine the feasibility of the product and "the public use or sale is only

**6**

incidental to the experimentation." In this case, the facts show that the concept of a roof cap in general was complete and acceptable to Sunroof and to GM before the cutoff date. In the judgment of this Court, the events which occurred thereafter were minor refinements. However, even if there was still some experimentation occurring after May 2, 1976, the facts seem to clearly indicate that the events in February, March and April of that year were indicative of a sale to GM primarily for commercial gain. Furthermore, there is no indication in the record that the order and/or the demonstrations during early 1976 were for anything but commercial gain. Rather, it appears that the refinements, which Plaintiff says were being conducted after May 2, 1976, were only incidental to the commercial sale to GM.

Thus, on the basis of the record, which includes affidavits, purchase orders, depositions, and letters announcing the product, all indications suggest that the Biarritz package was on sale by Sunroof before May 2, 1976. It would also appear that the *Timely Products* criteria, as well as the *Barmag* standards, have been satisfied here. Sunroof's own answers to interrogatories support this conclusion. Thus, it appears to this Court that (1) there is no genuine issue of a material fact, and (2) § 102(b) bars the validity of Sunroof's patent.

Accordingly, it is the determination of this Court that a summary judgment in favor of the C & C should be entered.

SO ORDERED.